ITT INDUSTRIES, INC., Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Intervenor.

No. 00–1296.

United States Court of Appeals, District of Columbia Circuit.

Argued March 23, 2001.

Decided June 5, 2001.

Richard B. Hankins argued the cause for petitioner. With him on the brief were Curtis L. Mack and Robert D. Harris.

Anna L. Francis, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Frederick L. Cornnell, Jr., Attorney.

Lynn K. Rhinehart argued the cause for intervenor International Union, United Automobile, Aerospace and Agricultural Implement Workers of America. With her on the brief were James B. Coppess and Blair Kay Simmons. Merrill J. Whitman entered an appearance.

Before: EDWARDS, Chief Judge, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

Petitioner ITT Automotive manufactures automotive parts at ten different plants across the Midwest, Arkansas, and New York. The present action involves the so-called "Northern Plants," three facilities located within a twenty-mile radius of one another in northeast Michigan. The Oscoda plant is the largest, with nearly 650 employees, while the Tawas and East Tawas plants each employ roughly 180 workers. During the relevant times at issue in this case, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW" or "Union"), was seeking to organize the employees at the Northern Plants. ITT and the UAW stipulated that the three plant facilities, together, constituted a single, appropriate bargaining unit for purpose of the representation election.

The unfair labor practice charges at issue arose in the midst of the Union's organization campaign. On two different occasions, employees from the Oscoda plant attempted to handbill in the East Tawas parking lot. Both times, East Tawas supervisors ordered them to leave under threat of arrest for trespass. The National Labor Relations Board ("NLRB" or "Board") found that management's enforcement of a no-access policy to union organizing by off-site employees constituted a violation of § 8(a)(1) of the National Labor Relations Act ("NRLA").

ITT argues that the Board overstepped its authority by extending greater access rights to off-site employees than those afforded nonemployee union organizers. Specifically, petitioner contends that the

Supreme Court's access cases make clear that "trespassers," whether nonemployee union organizers or off-site employees, possess only limited derivative § 7 access rights, *i.e.*, that any such rights derive entirely from on-site employees' § 7 organizational right to receive union-related information.

It is not clear that the Supreme Court's access cases foreclose the Board's interpretation that § 7 confers upon offsite employees some measure of free-standing, nonderivative organizational access rights. The Court's cases do make clear, however, that the Board must take account of an offsite employee's trespasser status. In the present case, the Board utterly failed to bring that consideration to bear, first, in its decision that § 7 extended any nonderivative access rights to off-site employees and, second, in its determination that the scope of those rights be defined by the same balancing test used to assess the scope of on-site employee access rights. We therefore vacate the Board's decision and remand for further consideration.

In a separate incident, East Tawas management reprimanded long time employee and union member Karen Richardson for harassing fellow workers with union solicitations during worktime. The Board found that management had violated § 8(a)(1) by discriminatorily applying the plant's facially neutral no-solicitation policy to union-related activity. The Board's decision on this point is supported by substantial evidence.

## I. BACKGROUND

In early 1998, the UAW, intervenor in this case, commenced an organizing campaign to unionize the nonsupervisory employees at the Northern Plants. The Union subsequently filed an election petition in June, and the Board scheduled a representation election for July 30, 1998. ITT and the UAW stipulated to an election covering a unit consisting of nonsupervisory employees from all three plants. With less than a week to go before the election, the UAW withdrew the petition. By that point in time, the unfair labor practice charges at the heart of this case had already been filed.

### A. Restrictions on Oscoda Employee Handbilling in the East Tawas Parking Lot

On April 28, 1998 and again on May 14, 1998, employees from the Oscoda plant entered the East Tawas parking lot in order to distribute Union literature and solicit signatures for the Union organizing petition. Despite the fact that the handbillers identified themselves as ITT employees from the Oscoda plant, supervisors from the East Tawas plant requested them to leave the premises because they were trespassing on private property. The handbilling employees left without incident. Shortly thereafter the UAW filed unfair labor practice charges with the Board, alleging that management's application of the no-access policy to off-site employees violated § 8(a)(1) of the NLRA.

At a hearing before an Administrative Law Judge ("ALJ"), petitioner presented evidence that its no-access policy was both neutral and justified. East Tawas supervisor Jeff Minnick testified that management had instigated the zero-tolerance, no-access policy in March 1998 following installation of a six-foot high cyclone fence around the parking lot. The new zero-tolerance policy limited parking lot access at all times solely to East Tawas employees. There was one exception: relatives or friends of employees could enter the parking lot to pick up/drop off East Tawas employees as long as they did not exit their vehicles. Minnick cited a number of precipitating events as grounds for the stricter policy, including several acts of

automobile vandalism, youths driving through the parking lot at night, nonemployees engaging employees in fights after work, and one incident in which an estranged husband of an East Tawas employee threatened to bring a gun to the plant in search of his wife.

The ALJ was unpersuaded by ITT's evidence. Quoting *Tri-County Medical Center, Inc. v. District 1199*, 222 N.L.R.B. 1089, 1976 WL 7839 (1976), the ALJ noted that, " 'except where justified by business reasons, a rule which denies off-duty employees entry to parking lots, gates, and other outside nonworking areas will be found invalid.' " *ITT Industries, Inc.*, 331 N.L.R.B. No. 7, at 4, 2000 WL 617063 (May 10, 2000) ("*Board Decision*") (quoting *Tri-County*, 222 N.L.R.B. at 1089). The ALJ was not impressed by the fact that the handbillers were not only off-duty, but also *offsite*, employees, remarking that "employees of the employer who work at one plant are still considered employees of the employer if they handbill at another of the employer's plants." *Board Decision*, at 4 (citing *S. Cal. Gas Co.*, 321 N.L.R.B. 551, 1996 WL 345762 (1996), and *U.S. Postal Serv.*, 318 N.L.R.B. 466 (1995)). Moreover, Oscoda and East Tawas employees belonged to the same representational unit. *Board Decision*, at 4.

Having found that the *Tri-County* test applied, the ALJ refused to consider ITT's evidence of reasonable alternative means available to the Oscoda handbillers for communicating with East Tawas employees. *Id.* As to the proffered justifications for applying the policy to off-site employees, the ALJ found ITT's reasons to be "woefully inadequate," and belied by the policy of permitting entry to friends and spouses to pick up or drop off East Tawas employees. *Id.* The Board affirmed the ALJ's decision, and ordered management at the Northern Plants to grant parking-lot access to off-site employees for the purpose of distributing union materials.

## B.   Reprimanding Karen Richardson for Union Solicitation during Worktime

On May 7, 1998, East Tawas plant manager Rod Kaschner and supervisor Jeff Binder called ten-year East Tawas employee and active union member Karen Richardson into Kaschner's office. Richardson memorialized the exchange in a letter to Kaschner of same date:

> Rod asked me to sit down. He then said he has had a few people on the floor complaining to him about me talking about union related activities and union information to them and they were offended. He told me then that any more conversations about the union were to be kept outside, in the lunch room and on my off time. *He said I wasn't to be talking about the union on the floor any more to anyone.*

Letter from Karen Richardson to Rod Kaschner (May 7, 1998) (emphasis added). Kaschner responded with his own letter the following day, in which he agreed with Richardson's description. He added only that "[t]he point again of the whole meeting was if an individual is not interested in talking with you about union activities, you should respect their wishes and avoid such discussions." Letter from Rod Kaschner to Karen Richardson (May 8, 1998). The Union filed an unfair labor practice charge with the Board alleging that East Tawas management had discriminatorily applied the plant's worktime no-solicitation policy to union solicitations in violation of Section 8(a)(1) of the NLRA.

Relying on the above letters as well as testimony from Richardson that she suffered no punishment and had resumed union solicitation on the floor after a mere seven days, the ALJ found that "the Act was [not] violated because management

was essentially telling Richardson not to bother her fellow employees ... and I see at most a de minimus or insignificant infringement on Karen Richardson's Section 7 rights." *Board Decision*, at 5. The Board disagreed.

The Board acknowledged that ITT's no-solicitation rule was valid on its face, inasmuch as it prohibited all solicitations of any kind by any employee during worktime. *Id.* at 1 (quoting ITTA NORTHERN PLANTS FLUID HANDLING EMPLOYEE HANDBOOK 31). In practice, however, the Board found that East Tawas management did not enforce the rule, letting employees and managers talk about a variety of subjects and engage in a number of solicitation activities at their work stations. According to the Board, Kaschner's and Binder's May 7 admonition "not to engage in *any* discussion of the Union with *any* employee on the production floor" constituted impermissible disparate treatment. *Board Decision*, at 2. The Board rejected the suggestion that the violation was somehow *de minimus* and ordered management to post notice that it would cease disparate enforcement of the neutral no solicitation policy. *Id.*

This petition for review of both § 8(a)(1) violations followed.

## II. ANALYSIS

Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations." 29 U.S.C. § 157 (1994). Section 8(a)(1) makes it an "unfair labor practice" for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]." 29 U.S.C. § 158(a)(1).

### A. Parking Lot Access of Off–Site Employees

■ For nearly fifty years, it has been black-letter labor law that the Board cannot order employers to grant nonemployee union organizers access to company property absent a showing that on-site employees are otherwise inaccessible through reasonable efforts. *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975 (1956); *see also Lechmere, Inc. v. NLRB*, 502 U.S. 527, 534, 112 S.Ct. 841, 117 L.Ed.2d 79 (1992); *Lucile Salter Packard Children's Hosp. at Stanford v. NLRB*, 97 F.3d 583, 587 (D.C.Cir.1996). It is likewise well-established that the Board has the authority, under Section 8(a)(1) of the NLRA, to prevent employers from posting parking lots against off-duty employees unless the employer presents valid business justifications for the restriction. *See Tri–County*, 222 N.L.R.B. at 1089 (setting forth test); *see also NLRB v. S. Md. Hosp. Ctr.*, 916 F.2d 932, 939–40 (4th Cir.1990) (relying on *Tri–County* test to affirm Board's determination that no-access policy constituted unfair labor practice because "limited neither to nonemployees nor to the interior of the hospital"); *NLRB v. Ohio Masonic Home*, 892 F.2d 449, 453 (6th Cir.1989) (affirming Board's application of *Tri–County* test to invalidate no-access policy applied to off-duty employees); *NLRB v. Pizza Crust Co. of Pa.*, 862 F.2d 49, 52–55 (3d Cir.1988) (same). ITT maintains that the Board overstepped its bounds by applying the *Tri–County* test off-the-rack to *off-site* employees, who, it argues, possess no greater § 7 access rights than are afforded nonemployee union organizers under the *Babcock* doctrine.

■ "Like other administrative agencies, the NLRB is entitled to judicial deference when it interprets an ambiguous provision of a statute that it administers." *Lechmere*, 502 U.S. at 536, 112 S.Ct. 841 (1992) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694

(1984)). Section 7 does not itself speak of access rights, much less the access rights of off-site employees. Such statutory silence would generally counsel *Chevron* deference. However, once courts have settled on a statute's clear meaning, " 'we adhere to that determination under the doctrine of *stare decisis,* and we judge an agency's later interpretation of the statute against [the] prior determination of the statute's meaning.' " *Lechmere,* 502 U.S. at 536–37, 112 S.Ct. 841 (quoting *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 131, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990)). With this principle in mind, we turn to prior judicial interpretation of § 7 access rights.

No court has decided the specific question we face here, *i.e.,* the scope of the Board's authority under §§ 7 and 8(a)(1) to prevent employers from prohibiting parking lot access to off-site employees who are seeking to engage in organizational activities that would be lawful if pursued by on-site employees. ITT asserts, however, that the Supreme Court's § 7 access cases compel application of the *Babcock* test, rather than the *Tri-County* test, in such situations. Despite the fact that *Babcock,* and more recently *Lechmere,* speak formally of the differing access rights guaranteed "employees" versus "nonemployees," ITT maintains that the two cases in actuality establish a functional distinction between the access rights guaranteed "invitees" versus "trespassers." In other words, ITT contends that, because "nonemployee" in the *Babcock* formulation is merely a proxy for "trespasser," the Board's application of the *Tri-County* test to trespassing off-site employees runs afoul of *Chevron* step one. We do not agree that the Court's decisions are so clear.

*Babcock* was itself a response to the Board's then-policy of assessing all parking-lot no-access rules under the same bal-

ancing test, regardless of whether the rule barred access of employees or nonemployee union organizers. Though the Court acknowledged the deference normally owed the Board, it nonetheless faulted the Board for "fail[ing] to make a distinction between rules of law applicable to *employees* and those applicable to *nonemployees.*" *Babcock,* 351 U.S. at 112, 76 S.Ct. 679 (emphasis added). Calling the distinction "one of substance," the Court held:

> No restriction may be placed on the employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline. But no such obligation is owed nonemployee organizers. Their access to company property is governed by a different consideration. The right of self-organization depends in some measure on the ability of employees to learn the advantages of self-organization from others. Consequently, if the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them, the employer must allow the union to approach his employees on his property.

*Id.* at 113, 76 S.Ct. 679 (citations omitted). In other words, nonemployees' access rights are merely derivative of on-site employees' organizational rights; nonemployees enjoy no independent, free-standing § 7 right of access. *See Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 206 n. 42, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). Though the Court did not explicitly contemplate the problem of the trespassing off-site employee, it did note that "[o]rganization rights are granted to workers by the same authority, the National Government, that preserves property rights. Accommodation between the two must be obtained with as little destruction of one as is con-

sistent with the maintenance of the other." *Babcock*, 351 U.S. at 112, 76 S.Ct. 679.

The Court revisited *Babcock* twenty years later in *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). Union member warehouse employees of Butler Shoe Company had gone on strike. In addition to picketing the warehouse where they actually worked, the strikers targeted Butler's nine Atlanta-area retail stores, including one inside the North De-Kalb Shopping Center. The general manager of the shopping center threatened arrest for trespass, after which the union filed unfair labor practice charges. The Board agreed with the union, and the Fifth Circuit affirmed because the mall's interior no picketing policy violated the First Amendment.

The Court reversed on the First Amendment ground, holding instead that "the rights and liabilities of the parties in this case are dependent exclusively upon the National Labor Relations Act." *Id.* at 521, 96 S.Ct. 1029. Though the Court ordered remand to allow the Board to decide the § 7 question in the first instance, it described the task facing the Board as follows:

> The *Babcock & Wilcox* opinion established the basic objective under the Act: accommodation of § 7 rights and private property rights "with as little destruction of one as is consistent with the maintenance of the other." The locus of that accommodation, however, *may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context.* In each generic situation, the primary responsibility for making this accommodation must rest with the Board in the first instance.

*Id.* at 522, 96 S.Ct. 1029 (quoting *Babcock*, 351 U.S. at 112, 76 S.Ct. 679) (emphasis added and citations omitted).

The Court equivocated on the proper scope of off-site employee § 7 access rights. Describing the Board's task on remand from *Hudgens*, the Court acknowledged that the underlying facts differed from those in *Babcock* "in several respects which may or may not be relevant in striking the proper balance," including that the alleged trespass "was carried on by Butler's employees (albeit not employees of its shopping center store), not by outsiders." *Hudgens*, 424 U.S. at 522, 96 S.Ct. 1029. On the other hand, the Court hinted that access rights might depend on one's status as a trespasser or invitee. Distinguishing *Babcock* from *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945), an earlier case in which the Court had affirmed a Board ruling that an employer may not prohibit distribution of organizational literature by employees in nonworking areas during nonwork time absent a showing that the ban was necessary to maintain plant discipline or production, the Court remarked: "A wholly different balance was struck when the organizational activity was carried on by employees already rightfully on the employer's property, since the employer's management interests rather than his property interests were there involved." *Hudgens*, 424 U.S. at 521–22 n. 10, 96 S.Ct. 1029.

In *Eastex, Inc. v. NLRB*, 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978), the Court again addressed the invitee/trespasser distinction. The underlying facts in *Eastex* resembled those of *Republic Aviation*–the employer had prohibited employees from distributing a union newsletter in nonworking areas during nonwork time. The Board ruled that the prohibition constituted an unfair labor practice, because the employer had failed to demonstrate sufficiently special circumstances to justify the ban. The Fifth Circuit affirmed. In upholding the Board's decision, the Court

explained the underlying concerns driving the different outcomes in *Babcock* and *Republic Aviation*:

> In *Babcock & Wilcox*, . . . nonemployees sought to enter an employer's property to distribute union organizational literature. The Board applied the rule of *Republic Aviation* in this situation, but the Court held that there is a distinction "of substance" between "rules of law applicable to employees and those applicable to nonemployees." The difference was that the nonemployees in *Babcock & Wilcox* sought *to trespass* on the employer's property, whereas the employees in *Republic Aviation* did not. Striking a balance between § 7 organizational rights and an employer's right to keep strangers from entering on its property, the Court held that the employer in *Babcock & Wilcox* was entitled to prevent "nonemployee distribution of union literature [on its property] if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message."

*Eastex*, 437 U.S. at 571, 98 S.Ct. 2505 (quoting *Babcock*, 351 U.S. at 112, 113, 76 S.Ct. 679) (emphasis added and citations omitted).

Following *Eastex* and seizing on the Court's balancing language from *Hudgens*, the Board in 1988 reformulated its approach to no-access policies, once again adopting a single balancing test for assessing the validity of no-access policies generally, whether enforced against employees or nonemployees. *See Jean Country*, 291 N.L.R.B. 11, 14 (1988) ("[I]n all access cases our essential concern will be the degree of impairment of the Section 7 right if access should be denied, as it balances against the degree of impairment of the private property right if access should be granted. We view the consideration of the availability of reasonably effective alternative means as especially significant in

this balancing process."). When the Board applied this test to strike down an employer's application of its parking-lot no-access policy to nonemployee union organizers, the Court in *Lechmere* intervened.

Noting that "[b]y its plain terms, . . . the NLRA confers rights only on *employees*, not on unions or their nonemployee organizers," *Lechmere*, 502 U.S. at 532, 112 S.Ct. 841, the Court recast *Babcock* in *Chevron* terms:

> In *Babcock*, . . . we held that the Act drew a distinction "of substance" between the union activities of employees and nonemployees. In cases involving *employee* activities, we noted with approval, the Board "balanced the conflicting interests of employees to receive information on self-organization on the company's property from fellow employees during nonworking time, with the employer's right to control the use of his property." In cases involving *nonemployee* activities (like those at issue in *Babcock* itself), however, the Board was not permitted to engage in that same balancing (and we reversed the Board for having done so). By reversing the Board's interpretation of the statute for failing to distinguish between the organizing activities of employees and nonemployees, we were saying, in *Chevron* terms, that § 7 speaks to the issue of nonemployee access to an employer's property. *Babcock*'s teaching is straightforward: § 7 simply does not protect nonemployee union organizers *except* in the rare case where "the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels."

*Id.* at 537, 112 S.Ct. 841 (quoting *Babcock*, 351 U.S. at 109–10, 112, 113, 76 S.Ct. 679) (citations omitted). The Court thus reaffirmed *Babcock*'s central thesis that § 7

extends only derivative access rights to nonemployee union organizers. The union itself, untethered to a threshold claim that § 7 employee organizational rights had been infringed, could not claim protection.

*Lechmere* and the Court's cases leading up to it simply do not answer the question before us. The Court never has professed to define the scope of the term "employee" in *Babcock, Hudgens, Republic Aviation, Eastex,* or *Lechmere.* And these cases certainly do not stand for the proposition that all trespassers, whether they be nonemployee union organizers *or* off-site employees, possess only derivative § 7 access rights. Because the Court's cases do not bespeak a clear answer, and because the statute is silent on the point, we must defer to the Board's interpretation *if reasonable.*

Before assessing the reasonableness of the Board's interpretation, we pause to consider the significance of the Eleventh Circuit's decision in *Southern Services, Inc. v. NLRB,* 954 F.2d 700 (11th Cir. 1992). There, Coca–Cola had enforced a no-access policy against an employee of a janitorial subcontractor who serviced Coca–Cola's secured industrial complex in Atlanta. The complex was "the only common workplace of the approximately 165 [subcontractor] employees who provide janitorial services to Coca–Cola under subcontract." *Id.* at 701. The Board ruled against Coca–Cola, despite the fact that the subcontractor's employees were technically "nonemployees" vis-à-vis Coca–Cola. The Eleventh Circuit affirmed, reasoning that:

> *Babcock & Wilcox* suggests two different routes for analyzing employer rights, which now diverge under this case's facts. *Babcock & Wilcox* implied that employers may restrict distribution by nonemployee organizers for the reason that those organizers are *trespassers.* Yet the holding addressed the

section 7 rights of *nonemployees*–a category of persons who are not necessarily trespassers on the employer's premises. But dicta in the Supreme Court's post-*Babcock & Wilcox* cases indicate that it is the organizer's status as a trespasser or stranger to the employee's property, rather than the nonemployee status, that invokes the employer's property right to restrict premises distribution by the organizer.

*Id.* at 703 (citations omitted).

Of course that decision as the opinion of another circuit is not binding here. Moreover, *Southern Services* issued only one month after *Lechmere* and contains no reference to the Supreme Court's decision. The Eleventh Circuit's opinion thus has limited persuasive value–it does not account for *Lechmere*'s express reaffirmation of the employee/nonemployee distinction, particularly its reliance on statutory mention of the term "employee." In any event, nothing in *Southern Services* is dispositive of the issue before us in this case.

When it is unclear under established law whether a category of workers enjoys free-standing, nonderivative access rights, then a court is obliged to defer to *reasonable* judgments of the Board in its resolution of cases that have not as yet been resolved by the Supreme Court. We have no doubt that the Board could attempt a justification within the bounds of *Babcock, Hudgens,* and *Lechmere* for why § 7 guarantees on-site subcontractor employees–like the SSI janitors at Coca Cola–nonderivative access rights similar to those enjoyed by on-site employees of the firm owning the site. Obviously, this is not a question before us. We make the point only to say that the Board, in the first instance under *Chevron* step two, must be allowed to define the limits of the NLRA in assessing the legality of no-ac-

cess, no-solicitation rules not yet considered by the Supreme Court.

■ Although the Court's access cases do not foreclose the possibility that off-site employees might enjoy some measure of free-standing, nonderivative access rights, they do make clear that the reasonableness of such an interpretation depends in large part on the Board's considered justifications for extending greater access rights to trespassing employees than trespassing nonemployee union organizers. "In determining whether an agency's interpretation represents a reasonable accommodation of conflicting statutory purposes, a reviewing court must determine both whether the interpretation is arguably consistent with the underlying statutory scheme in a substantive sense and whether 'the agency considered the matter in a detailed and reasoned fashion.'" *Rettig v. Pension Benefit Guar. Corp.*, 744 F.2d 133, 151 (D.C.Cir.1984) (quoting *Chevron*, 467 U.S. at 865, 104 S.Ct. 2778). With this principle in mind, we simply cannot assess the reasonableness of the Board's decision to apply the *Tri-County* test to off-site employees in the present case.

First, the Board failed even to acknowledge that the question of off-site employee access rights was an open one, *i.e.*, that, in *Chevron* terms, § 7 and the Court's cases are silent on the issue. Rather, the Board decided *sub silentio* that § 7 guarantees all off-site employees, whether members of the same bargaining unit or not, some measure of free-standing, nonderivative access rights. *See Board Decision* at 4 ("[E]mployees of the employer who work at one plant are still considered employees of the employer if they handbill at another of the employer's plants."). Indeed, by applying the *Tri-County* balancing test, the Board decided without analysis that trespassing off-site employees possess access rights equivalent to those enjoyed by on-site employee invitees. Because it is by no means obvious that § 7 extends nonderivative access rights to off-site employees, particularly given the considerations set forth in the Court's access cases, the Board was obliged to engage in considered analysis and explain its chosen interpretation.

At oral argument, Government counsel insisted that the Board had already provided such an explanation in its prior off-site employee access cases and should not be required to repeat its justifications here. *See Eagle–Picher Industries, Inc.*, 331 N.L.R.B. No. 14, 2000 WL 673943 (May 19, 2000); *S. Cal. Gas Co.*, 321 N.L.R.B. 551, 1996 WL 345762 (1996); *U.S. Postal Serv.*, 318 N.L.R.B. 466, 1995 WL 506875 (1995). The Government is certainly correct that the Board is not obligated to justify its interpretation anew with every application if it has done so adequately in a previous decision. None of the Board's previous cases, however, take any account of the Court's different access decisions or the trespass considerations articulated therein. Indeed, the most extensive treatment of the interpretive question can be found in *United States Postal Service*, 318 N.L.R.B. at 467. Rejecting arguments that the *Babcock* test rather than the *Tri-County* test should apply to off-site employees, the Board stated only:

> No case has been cited which would warrant the distinction which Respondent proposes. In the instant case Respondent's employees enjoy the same benefits and working conditions regardless of the facility at which they work. For example, vacation benefits accrue in the same manner and rate regardless of an employee's assigned facility. Years of employment are counted toward an employee's pension from the day the employee is hired to the day he or she retires, regardless of which facility he or she is assigned to. In addition, an em-

ployee who is involuntarily transferred from one postal facility to another maintains his or her seniority regardless of the change of facility. In *Nashville Plastic Products,* supra, the Board recognized that "the rule enunciated in *Lechmere* does not apply to employees." No distinction was made as to whether an employee worked at any particular facility. In addition, in *Tri-County,* supra, the Board prohibited a rule which denied off-duty employees entry to parking lots, gates, and other outside nonworking areas. Again, no distinction was made as to whether the off-duty employee worked at any particular facility. Accordingly, I believe that the rule enunciated in *Tri–County Medical Center,* supra, is controlling in the instant proceeding.

*Id.* Noticeably absent from this discussion is any mention of the employer's property rights or the different interpretive considerations presented by trespassing employees. There is certainly no consideration of the degree to which extending nonderivative access rights to off-site employees might intrude upon state trespass laws. *See Sears, Roebuck & Co.,* 436 U.S. at 205, 98 S.Ct. 1745 (holding that NLRA, as interpreted in *Babcock,* did not preempt state trespass laws in part because "permitting state courts to evaluate the merits of an argument that certain trespassory activity is protected does not create an unacceptable risk of interference with conduct which the Board, and a court reviewing the Board's decision, would find protected. For while there are unquestionably examples of trespassory union activity in which the question whether it is protected is fairly debatable, experience under the Act teaches that such situations are rare and that a trespass is far more likely to be unprotected than protected"). Moreover, many of the organizational considerations cited by the Board are situation-specific

and would not justify the general rule adopted here. We therefore vacate the Board's decision and remand for the Board to consider and craft its interpretation in light of these concerns.

Second, even were we here to find reasonable the Board's decision to read into § 7 some measure of free-standing, nonderivative access rights for off-site employees, the Board nevertheless failed to explain why the scope of such rights should be defined by the same *Tri-County* balancing test used to delineate the scope of on-site employee access rights. *Lechmere* makes clear that, even as to on-site employees, the Board must balance the conflicting interests of employees to receive information on self-organization on the company's property from fellow employees during nonwork time with the employer's right to control the use of his property. *See Lechmere,* 502 U.S. at 534, 112 S.Ct. 841.

It is obvious that the interests of employees located on a single employer site do not always coincide with the collective interests of employees located on several different sites. Indeed, this may be so even when employees on different sites are part of a single representational unit. The "balance" of conflicting interests may change dramatically when "employees" are widely dispersed at different employer locations, both because the employees' interests and working arrangements may be dissimilar and also because the employer's right to control the disputed premises likely implicates security, traffic control, personnel, and like issues that do not arise when only on-site employee access is involved. If, on remand, the Board determines that § 7 indeed extends nonderivative access rights to off-site employees, it must then adopt a balancing test that takes proper account of an employer's predictably heightened property concerns.

## B. Disparate Application of No–Solicitation Rule

We need not pause long over the Board's determination that East Tawas management committed an unfair labor practice in reprimanding Karen Richardson. "Even if the court might have reached a different conclusion had the court considered the issue *de novo*, the court will uphold the Board's decision if it is supported by substantial evidence in the record." *Frazier Indus. Co. v. NLRB*, 213 F.3d 750, 756 (D.C.Cir.2000).

Petitioner argues that, in reprimanding Richardson, management was simply applying a facially neutral no-solicitation policy. That is beside the point. Though facially neutral restrictions on worktime solicitations in work areas are presumptively valid, an employer commits an unfair labor practice when it applies the rule in non-neutral fashion to union activities. *See Restaurant Corp. of Am. v. NLRB*, 827 F.2d 799, 804–05 (D.C.Cir. 1987). The Board found that East Tawas management had not traditionally enforced the rule, allowing "employees and managers to talk about various subjects while at their work stations as long as it did not interfere with production and to engage in a variety of solicitation activities, usually for some charitable cause." *Board Decision*, at 1. Substantial evidence supports this finding. *See* Transcript of ALJ Hearing ("Tr.") at 115–18 (testimony of Karen Richardson) (testifying as to various charitable solicitation drives conducted during worktime); Tr. at 100–02 (testimony of Karen Richardson) (testifying that supervisors often talk about nonwork-related issues with employees on the floor).

Conceding that the evidence might support a finding that East Tawas management generally tolerates worktime solicitations, petitioner argues that management has never maintained a policy of allowing *harassing* solicitations, such as that attributed to Richardson. We agree that substantial evidence would not support a finding that management generally tolerates solicitations in the face of harassment complaints. Indeed, Richardson herself testified that, despite often talking about the Union on the floor with fellow employees, this was the only time she had ever been reprimanded for doing so. *See* Tr. at 123–24.

Petitioner's argument nonetheless misses the crucial point. The Board took issue with the fact that "Kaschner and Binder responded [to the complaints] by warning Richardson on May 7 not to engage in *any* discussion of the Union with *any* employee on the production floor." *Board Decision*, at 2. In other words, the warning was both impermissibly overbroad, in that it required her to cease Union discussion with other employees altogether rather than simply those expressing discomfort, and impermissibly underbroad, in that it required her to cease Union-related discussions only. Richardson's uncontroverted letter, the correctness of which Kaschner conceded in his response of the following day, constituted substantial evidence in support of the Board's finding of discriminatory over and under–breadth. *See* Letter from Karen Richardson to Rod Kaschner.

## CONCLUSION

We deny ITT's petition for review of the § 8(a)(1) violation pertaining to the disparate application of the disputed nosolicitation rule. However, we vacate the Board's determination that ITT committed an unfair labor practice by applying its no-access policy to off-site handbilling employ-

ees and remand to the Board for further proceedings consistent with this opinion.

*So ordered.*