RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0337P (6th Cir.)
File Name: 03a0337p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

FIRST HEALTHCARE
CORPORATION, d/b/a
HILLHAVEN BAKERSFIELD,
d/b/a HILLHAVEN HIGHLAND
HOUSE, d/b/a HEALTHCARE
CORPORATION IN THE STATE
OF CALIFORNIA,
      *Petitioner/*
*Cross-Respondent,*

      *v.*

NATIONAL LABOR RELATIONS
BOARD,
      *Respondent/*
*Cross-Petitioner,*

SERVICE EMPLOYEES
INTERNATIONAL UNION,
LOCAL 399,
      *Intervenor.*

> Nos. 01-2478/2673

On Petition for Review and Cross-Application
for Enforcement of an Order
from the National Labor Relations Board.

Nos. 31-CA-20973; 31-CA-21091; 31-CA-21551.

Argued: April 29, 2003

Decided and Filed: September 19, 2003

Before: CLAY and GIBBONS, Circuit Judges; DUGGAN,
District Judge.[*]

———————

**COUNSEL**

**ARGUED:** John V. Nordlund, Fairfax, California, for
Petitioner. Jill Griffin, NATIONAL LABOR RELATIONS
BOARD, OFFICE OF THE GENERAL COUNSEL,
Washington, D.C., for Respondent. Andrew L. Strom, SEIU
LOCAL 32BJ, LEGAL DEPARTMENT, New York, New
York, for Intervenor. **ON BRIEF:** John V. Nordlund,
Fairfax, California, Leslie M. Mitchell, LAW OFFICE OF
LESLIE M. MITCHELL, Sacramento, California, for
Petitioner. Jill Griffin, Aileen A. Armstrong, Frederick C.
Havard, NATIONAL LABOR RELATIONS BOARD,
OFFICE OF THE GENERAL COUNSEL, Washington, D.C.,
for Respondent. Andrew L. Strom, SEIU LOCAL 32BJ,
LEGAL DEPARTMENT, New York, New York, Craig
Becker, Chicago, Illlinois, for Intervenor.

   CLAY, J., delivered the opinion of the court, in which
DUGGAN, D. J., joined. GIBBONS, J. (pp. 39-46), delivered
a separate dissenting opinion.

———————

[*] The Honorable Patrick J. Duggan, United States District Judge for
the Eastern District of Michigan, sitting by designation.

---

**OPINION**

---

CLAY, Circuit Judge.  In Case No. 01-2478, Petitioner, First Healthcare Corporation, d/b/a Healthcare Corporation in the State of California, d/b/a Hillhaven Highland House, d/b/a Hillhaven Bakersfield, petitions this Court for review of the September 30, 2001, decision and order from Respondent, the National Labor Relations Board ("NLRB" or "the Board"), finding that Petitioner violated section 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 141 *et seq.*, by denying access to its property to persons who were employed at another facility owned by Petitioner, and by maintaining a policy of denying off-duty employees access to the outside non-working areas of the facilities where they were employed. In Case No. 01-2673, the Board seeks this Court's enforcement of the September 30, 2001, decision and order.

Because there is substantial evidence to support the Board's findings of fact, and because there are no errors of law[1] in the decision, we **DENY** Petitioner's request for review of the Board's September 30, 2001, decision and order in Case No. 01-2478, and **GRANT** the Board's application for enforcement of the order in Case No. 01-2673.

**BACKGROUND**
**Procedural History**

This case originated with unfair labor practice charges filed against Petitioner by the Service Employees International Union and two of its affiliates, Local 399 and Local 22 (collectively "the Union"), between January 3 and

---

[1] We emphasize that we review the legal basis upon which the Board applied its factual findings de novo.  Thus, the dissent's contention that we failed to apply a de novo standard to the Board's legal conclusions is simply wrong.

September 22, 1995.  (NLRB Cases 31-/CA-20973, 31CA-21091, and 31CA-21551.)    The Board subsequently consolidated the cases.    The parties submitted the consolidated case directly to the Board for a decision based on a stipulation of facts on December 4, 1995.  Thereafter, on September 30, 1996, the Board ruled that it had improvidently accepted the stipulation, and remanded the case for a trial to determine the object of the trespassory conduct at issue.

On June 8-11, 1998, a trial was held before Administrative Law Judge ("ALJ") Steven Charno, and on July 21, 1998, the ALJ issued a decision from the bench finding that Petitioner had violated section 8(a)(1) of the Act.  All parties filed timely exceptions to the ALJ's decision with the Board.  On September 30, 2001, the Board issued its decision which is now before the Court on petition for review by Petitioner and on application for enforcement by the NLRB. *See First Healthcare Corp.*, 336 N.L.R.B. No. 62, 168 L.R.R.M. (BNA) 1368, 2001 WL 1685280 (Sept. 30, 2001).  Pursuant to this Court's March 10, 2003, order, the Union's motion to participate in oral argument has been granted.

**Facts**

Petitioner operates nursing homes at various locations in California.    The Union represents employees at some of Petitioner's nursing homes, while some of Petitioner's homes operate as nonunion facilities.  Since January of 1990, successive employee handbooks for Petitioner's nonunion service staff in California have included a solicitation and distribution rule with two provisions.  The first provision states:  "When you are off-duty, don't return to the facility unless you are picking up your paycheck or are making an authorized visit." (J.A. at 848.)  An "authorized visit" was defined by Petitioner as a return to the facility for "a work/job-related reason."    (J.A. at 686.)    The second provision states: "[N]on-employees are not allowed to solicit or distribute material while on facility property." (J.A. at 679 n.5.)  Petitioner has interpreted this latter provision to apply

to employees who solicit and distribute at facilities other than the facility to which the employees are assigned to work (a/k/a "offsite employees").

On September 17, 1994, Petitioner's employee Alfredo Chavez met with three non-employee union organizers at Petitioner's Highland House facility just prior to the 3:00 p.m. shift change. Chavez was employed by Petitioner as a janitor at Petitioner's Alta Vista facility. Chavez walked to the parking lot outside the employees' entrance at the back of the Highland House facility with flyers that were printed in both Spanish and English. The flyers, which were captioned "Let's Get Together," pointed out the benefits of union membership, solicited the recipients to join the Union, and contained a postage prepaid card which could be returned for additional "information about joining the Service Employees International Union." (J.A. at 687, 818-19.) Chavez identified himself as one of Petitioner's employees, and spoke with approximately four employees about the value of the Union, before he was joined by union organizer Blanca Correa.

Correa and Chavez had spoken to four more employees when they were approached by Highland House administrator, Carol Bowman-Jones. Both Correa and Highland House employee Bill Harvey identified Chavez as one of Petitioner's employees. Nonetheless, Bowman-Jones ordered Chavez to leave the premises, threatening to call the police if he refused to leave. Chavez complied with Bowman-Jones' order to leave the premises.

About four months later, at approximately January 26, 1995, a group of non-employee union organizers and offsite employees assembled at the Highland House facility for the purpose of handing out union literature which 1) disputed Petitioner's prior claim that the union made no promises "it could not keep," and 2) invited Highland House employees to join the Union. (J.A. at 687.) It is uncontroverted that approximately forty-five minutes later, Jack Quiroz, the

maintenance supervisor at Highland House, was observed shutting the facility's back gate which required that the gate thereafter be manually opened to allow cars to enter or exit the facility through that gate. The main entrance and exit to the facility were at the front of the building.

At approximately 2:00 p.m. on July 12, 1995, Jenny Davenport, an employee of Petitioner's Alta Vista facility, along with union organizers Gary Guthman and Karla Zombro, spoke with employees at Petitioner's Bakersfield facility (also referred to as the California Care Center facility) about joining the Union. Davenport was wearing her badge issued by Petitioner which bore Davenport's name and Petitioner's logo. Davenport took some of the union literature and went to an outdoor break area next to the parking lot on Petitioner's premises, and began talking with a Bakersfield employee about the benefits of unionization. Davenport also carried leaflets that described the value of unionization and urged employees to make inquiries on "'how to get involved in fighting for union rights for your facility.'" (J.A. at 813.)

Shortly thereafter, Maria Favereaux, business manager at Petitioner's Bakersfield facility, came out of the facility and approached Davenport. Davenport informed Favereaux that she was employed by Petitioner and asserted a legal right as one of Petitioner's employees to be on the premises. Favereaux went inside the facility and telephoned Petitioner's legal counsel. Favereaux then emerged outside with environmental services manager Tim Haub, and Favereaux instructed Davenport to leave the Bakersfield premises. As Haub and Favereaux escorted Davenport off of the premises, they were approached by Guthman, who questioned the decision to deny Davenport access to the outside non-working areas. Haub responded that employees could not distribute materials on Petitioner's property "unless they had the approval of Management." (J.A. at 60, 687.)

Based on the foregoing facts, the Board agreed with the ALJ and found that Petitioner had violated section 8(a)(1) of

the Act by enforcing against off-site employees its solicitation and distribution policy prohibiting non-employees from any solicitation and distribution at Petitioner's facilities. The Board also affirmed the ALJ's finding that Petitioner had violated section 8(a)(1) of the Act by maintaining, at least until July 12, 1995, a rule that prohibited off-duty employees from returning to the non-work areas of the facilities where they worked to engage in organizational activity unless "authorized" by Petitioner.

The Board ordered Petitioner to cease and desist from engaging in these unfair labor practices, particularly with respect to Petitioner's enforcing its no-solicitation rule in a manner so as to deny its off-site employees access to parking lots and other non-work areas for the purpose of engaging in union solicitation and/or distribution. The Board also directed Petitioner to rescind the rule contained in its employee handbook stating that employees who are off-duty may not "return to the facility unless [they] are picking up [their] paycheck or making an authorized visit" and to notify employees of this recision. (J.A. at 685.) Finally, the Board ordered Petitioner to post a remedial notice at all of its nonunion facilities in California.

## DISCUSSION

## I. STANDARD OF REVIEW

Under the Act, the scope of this Court's review of the Board's findings is limited. That is, "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision." *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985) (per curiam). Although this Court "should consider the evidence contrary to the Board's conclusions," it "may not conduct a de novo review of the record." *Id.* (citing *Union Carbide Corp. v. NLRB*, 714 F.2d

657, 600 (6th Cir. 1983)). "When there is conflict in the testimony, 'it is the Board's function to resolve questions of fact and credibility,' and thus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." *Id.* (quoting *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir. 1984)).

In addition, "[t]he Board's application of the law to particular facts is also reviewed under the substantial evidence standard . . . ." *Id.* However, "[i]f the Board errs in determining the proper legal standard, the appellate court may refuse enforcement on the grounds that the order has 'no reasonable basis in law.'" *Id.* (quoting *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979)).

**II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT PETITIONER VIOLATED SECTION 8(a)(1) OF THE ACT BY PROHIBITING ITS EMPLOYEES FROM ENGAGING IN ORGANIZATIONAL SOLICITATION AND DISTRIBUTION ACTIVITIES IN OUTSIDE NONWORKING AREAS AT FACILITIES OTHER THAN THE FACILITY WHERE THEY WORK**

**A. Legal Standards Regarding Solicitation and/or Distribution Rights Under Section 7 of the Act**

Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations." 29 U.S.C. § 157. Section 8(a)(1) makes it an "unfair labor practice" for any employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]." 29 U.S.C. § 158(a)(1).

The organizational solicitation and/or distribution rights under Section 7 of off-duty offsite employees—that is, employees of a single company who engage in organizational activity at a company facility other than that to which they

have been assigned to work—is an issue upon which the NLRB has spoken but not one upon which the Supreme Court has spoken. In addition, while the District of Columbia Circuit not long ago had the issue of what, if any, Section 7 rights off-site employees enjoy, the D.C. Circuit declined to speak affirmatively on the matter, but instead remanded the matter back to the Board for further determination. In other words, an issue of first impression is before this Court upon which there is little said directly on point in the relevant jurisprudence. As a result, we shall paint the legal landscape surrounding the matter with a broad brush so as to allow for proper consideration of the issue.

To begin, it has been black-letter law for nearly fifty years that the Board cannot order employers to grant non-employee union organizers access to company property absent a showing that onsite employees are otherwise inaccessible through reasonable efforts. *NLRB v. Babock & Wilcox Co.*, 351 U.S. 105, 112 (1956); *see also Lechmere, Inc. v. NLRB*, 502 U.S. 527, 534 (1992).

In *Tri-County Medical Center, Inc. v. District 1199*, 222 N.L.R.B. 1089 (1976), the Board considered the issue of whether it could prevent employers from denying off-duty employees access to outside non-working areas of the facility at which they were employed for purposes of exercising Section 7 rights. The Board found that it had authority under Section 8(a)(1) of the Act to prevent employers from denying off-duty onsite employees access to parking lots, gates, and other outside non-working areas for purposes of exercising Section 7 rights, unless the employer had "justified business reasons" for doing so. *Id.* This Court affirmed the Board's application of the *Tri-County* test to invalidate a no-access policy applied to off-duty onsite employees in *NLRB v. Ohio Masonic Home*, 892 F.2d 449, 453 (6th Cir. 1989).

In *Southern California Gas Co.*, 321 N.L.R.B. 551 (1996), and *Postal Service*, 318 N.L.R.B. 466 (1995), the Board applied the rule of *Tri-County* in finding that it had authority

under Section 8(a)(1) to prevent an employer from denying visiting "off-site" employees access to outside non-working areas of the employer's property for the purpose of exercising Section 7 rights. The Board followed *Southern California Gas Co.* and *Postal Service* in deciding *ITT Industries, Inc.*, 331 N.L.R.B. 7 (2000), thus preventing the employer in that case from denying off-duty offsite employees who were seeking to exercise their organizational rights access to outside non-working areas.

The employer in *ITT Industries, Inc.*, ITT Automotive ("ITT"), petitioned the District of Columbia Court of Appeals for review, and the Board cross-petitioned for enforcement of the Board's decision. *See ITT Indus., Inc. v. NLRB*, 251 F.3d 995, 996 (D.C. Cir. 2001). The D.C. Circuit denied ITT's petition for review of an issue not relevant here, but vacated the Board's determination that ITT committed an unfair labor practice by applying its no-access policy to offsite employees seeking to distribute pro-union handbills and solicit signatures for the union organizing petition, and remanded the matter to the Board for further proceedings consistent with the court's opinion. *Id.* at 1006-007. In doing so, the court began by noting that under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), the NLRB is entitled to judicial deference when it interprets an ambiguous provision of a statute that it administers, and that because Section 7 does not itself speak of access rights, much less access rights of offsite employees, such statutory silence would counsel *Chevron* deference unless courts have settled on the statute's clear meaning. *ITT Indus., Inc.*, 251 F.3d at 1000 (citing *Lechmere*, 502 U.S. at 536-37).

With this principle in mind, the D.C. Circuit then surveyed the landscape of relevant Supreme Court decisions so as to determine whether *Chevron* deference was in order—*i.e.*, whether the judicial pronouncements have settled on Section 7's meaning. *Id.* The court began by examining the Court's decision in *Babcock*, 351 U.S. at 112, wherein it was held that the access rights of non-employees are derivative of the

access rights of onsite employees; that is, non-employees enjoy no independent, free-standing Section 7 right of access. 251 F.3d at 1000.

The D.C. Circuit then looked to the Court's decision in *Hudgens v. NLRB*, 424 U.S. 507 (1976), rendered some twenty years after *Babcock* was handed down. *See* 251 F.3d at 1001. In *Hudgens* the Court ultimately remanded the matter back to the Board to decide the Section 7 question in the first instance; however, in doing so, the Court acknowledged that the facts in *Hudgens* differed from those of *Babcock* because the alleged trespass onto the employer's property "was carried on by [the employer's] employees (albeit not employees of its shopping center store), not by outsiders." 424 U.S. at 522. The *Hudgens* Court also distinguished *Babcock* from *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945), an earlier decision wherein the Court affirmed a Board ruling that an employer may not prohibit distribution of organizational materials by employees in non-working areas during non-work hours absent a showing that the ban was necessary to maintain plant discipline or production. *Hudgens*, 424 U.S. at 521-22 n.10. The *Hudgens* Court noted that "[a] wholly different balance was struck when the organizational activity was carried on by employees already rightfully on the employer's property, since the employer's management interests rather than his property interests were there involved." *Id.*

Next, the D.C. Circuit recognized that in *Eastex, Inc. v. NLRB*, 437 U.S. 556 (1978), the Court explained the underlying concerns driving the different outcomes in *Babcock* and *Republic Aviation*. *ITT Indus., Inc.*, 251 F.3d at 1001. Specifically, the *Eastex* Court had observed that

[i]n *Babcock & Wilcox*, . . . nonemployees sought to enter an employer's property to distribute union organizational literature. The Board applied the rule of *Republic Aviation* in this situation, but the court held that there is a distinction "of substance" between "rules of

law applicable to employees and those applicable to nonemployees." The difference was that the nonemployees in *Babcock & Wilcox* sought to trespass on the employer's property, whereas the employees in *Republic Aviation* did not. Striking a balance between § 7 organizational rights and an employer's right to keep strangers from entering on its property, the Court held that the employer in *Babcock & Wilcox* was entitled to prevent "nonemployee distribution of union literature [on its property] if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message."

*Eastex*, 437 U.S. at 571 (quoting *Babcock*, 351 U.S. at 112-13) (citations omitted).

Finally, the D.C. Circuit recognized that in *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 532 (1992), the Supreme Court sharpened the distinction between employee/non-employee Section 7 rights. 251 F.3d at 1002. In *Lechmere*, the Court stated that "by its plain terms, . . . the NLRA confers rights only on *employees*, not on unions or their nonemployee organizers . . . ." *Lechmere*, 502 U.S. at 532 (emphasis is original).

With this background into the controlling jurisprudence in mind, the D.C. Circuit found that neither *Lechmere* nor "the Court's cases leading up to it" answered the question of whether off-duty offsite employees enjoyed nonderivative Section 7 organizational rights, or whether the offsite employees' organizational rights were merely derivative. 251 F.3d at 1003. As a result, the D.C. Circuit concluded that "[b]ecause the [Supreme] Court's cases do not bespeak a clear answer, and because the statute is silent on the point, we must defer to the Board's interpretation *if reasonable*." *Id.* (emphasis in original).

The D.C. Circuit went on to address the reasonableness of the Board's decision in *ITT Industries*, and found that the

Board's decision was conclusory and lacked sufficient consideration or analysis of the interests involved. *Id.* at 1004. Specifically, the D.C. Circuit opined in relevant part regarding the deficiencies it found with the Board's decision:

> First, the Board failed even to acknowledge that the question of off-site employee access rights was an open one, *i.e.*, that, in *Chevron* terms, § 7 and the Court's cases are silent on the issue. Rather, the Board decided *sub silento* that § 7 guarantees all off-site employees, whether members of the same bargaining unit or not, some measure of free-standing, nonderivative rights. *See Board Decision* at 4 ("[E]mployees of the employer who work at one plant are still considered employees of the employer if they handbill at another of the employer's plants."). Indeed, by applying the *Tri-County* balancing test, the Board decided without analysis that trespassing off-site employees possess access rights equivalent to those enjoyed by on-site employee invitees. Because it is by no means obvious that § 7 extends nonderivative access rights to off-site employees, particularly given the considerations set forth in the Court's access cases, the Board was obliged to engage in considered analysis and explain its chosen interpretation.

> * * *

> Second, even were we here to find reasonable the Board's decision to read into § 7 some measure of free-standing, non-derivative access rights for off-site employees, the Board nevertheless failed to explain why the scope of such rights should be defined by the same *Tri-County* balancing test used to delineate the scope of on-site employee access rights. *Lechmere* makes clear that, even as to on-site employees, the Board must balance the conflicting interests of employees to receive information on self-organization on the company's property from fellow employees during nonwork time

> with the employer's right to control the use of his property. *See Lechmere*, 502 U.S. at 534.

*ITT Indus., Inc.*, 251 F.3d at 1004-005.

**B.    The Board's Decision**

At the time the instant case was decided by the Board, it had the benefit of the D.C. Circuit's criticisms of *ITT Industries, Inc.*, although the D.C. Circuit's mandate had yet to issue and the Board had not received additional briefing by the parties on the subject of the remand. The Board found that it was "guided by" the D.C. Circuit's decision nonetheless, and thus concluded as follows regarding the instant case:

> (1) under Section 7 of the Act, offsite employees (in contrast to nonemployee union organizers) have a nonderivative access right, for organizational purposes, to their employer's facilities; (2) that an employer may well have heightened property-right concerns when offsite (as opposed to onsite) employees seek access to its property to exercise their Section 7 rights; but (3) that, on balance, the Section 7 organizational rights of offsite employees entitle them to access to the outside, non-working areas of the employer's property, except where justified by business reasons, which may involve considerations not applicable to access by off-duty, on-site employees. To this extent, the test for determining the right to access for offsite visiting employees, differs, at least in practical effect, from the *Tri-County* test for off-duty, on-site employees.

*NLRB v. First Healthcare Corp.*, 2001 WL 1685280, at *3. In reaching this conclusion, the Board took into consideration the main two criticisms expressed by the D.C. Circuit in *ITT Industries, Inc.*: 1) inadequate analysis as to the Section 7 access rights of off-duty, offsite employees seeking access for the purpose of engaging in organizational activity, 2) and

inadequate analysis of the private property rights of employers as to such individuals when balancing the interests involved. *Id.*

## 1. Section 7 Rights of Offsite Employees

As to the Section 7 rights of offsite employees, the Board began by agreeing with the D.C. Circuit's observation that "the Supreme Court's decisions 'certainly do not stand for the proposition that all trespassers, whether they be non-employee union organizers *or* offsite employees, possess only derivative [Section] 7 access rights.'" *First Healthcare Corp.*, 2001 WL 1685280, at *4 (quoting *ITT Indus., Inc.,* 251 F.3d at 1002) (emphasis in *ITT Indus.*)). Rather, the Board opined, under the Supreme Court's decisions, "offsite employees are fundamentally different from non-employee union organizers, although the situation of offsite employees is not identical to that of onsite employee invitees." *Id.* (comparing *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (addressing access rights of non-employee union organizers) with *Republic Aviation v. NLRB*, 324 U.S. 793 (1945) (addressing protected activity by onsite employees) and *Eastex, Inc. v. NLRB*, 437 U.S. 556 (1978) (same)).

The Board went on to observe that "[o]ffsite employees are not only 'employees' within the broad scope of Section 2(3) of the Act, they are 'employees' in the narrow sense: 'employees of a particular employer' (in the Act's words), that is, employees of the employer who would exclude them from its property." *Id.* The Board further observed that the offsite workers are significantly different in several important respects from those persons who themselves have no employment relationship with the particular employer. *Id.* For example, the Board observed that as compared to non-employees, the Section 7 rights of offsite employees "involve not just the shared interests of statutory employees as members of the working class, or as employees working in the same sector, industry, or community, but as employees working for the same employer." *Id.* The Board found this

significant because "[n]othing in either the Act or the Supreme Court's decisions establishes that the Section 7 rights of employees of a particular employer, *as against that employer*, are somehow derivative of other employees' rights, when they are exercised at a location other than the customary site of employment." *Id.* (emphasis in original).

The Board also observed that offsite employees were significantly different from onsite employees in that when an offsite employee seeks to encourage union organization at the company for which he works (the parent company of the individual locations), he seeks to do so for his own welfare even though he is engaging in the organizational activity at a company location other than that to which he is assigned. *Id.* The Board found this distinction significant because in attempting to organize the unorganized, there is strength in numbers to increase the power of the union and ultimately to improve the working conditions for the onsite and offsite worker alike. *Id.* (citing *Food & Commercial Workers Locals 957, 7, & 1036 (Meijer, Inc.*), 329 NLRB 730, 734 (1999) ("[T]here is abundant evidence that, in collective bargaining, unions are able to obtain higher wages for the employees they represent . . . when the employees of employers in the same competitive market are unionized.")) That is, when "off-site employees seek to organize fellow employees, they act *within* the immediate employee-employer relationship." *Id.* (emphasis in original.) Thus, the Board concluded, "[t]he core concerns of Section 7, which protects the 'right to self-organization,' undeniably are implicated." *Id.*

In short, the Board found that the interests shared among onsite as well as offsite employees such as "wages, benefits, and other work-place issues [are those] that may be addressed by concerted action." *Id.* at 5. The Board recognized the D.C. Circuit's observation in *ITT Industries* that the "'interests of employees located on a single employer site do not always coincide with the collective interests of employees located on several different sites.'" *Id.* (citing 251 F.3d at 1005). However, the Board found that

[t]he fact remains that employees often will share significant interests, even if their interests are not identical. In a particular case, the fact that offsite employees are seeking to organize their fellow employees suggests that they believe there *is* a basis to make common cause. There is some merit in taking into account employees' judgments of their own interests.

*Id.* Thus, the Board concluded that for all of the above-cited reasons, "the Section 7 rights of offsite employees are non-derivative and substantial." *Id.*

### 2. Employer's Private Property Interests

In order to satisfy the D.C. Circuit's second concern expressed with the Board's decision in *ITT Industries*—that under *Lechmere*, even as to onsite employees, the Board must balance the conflicting interests of employees to receive information on self-organization on the company's property from fellow employees during non-work time with the employer's right to control the use of its property—the Board next addressed Petitioner's private property interests. *Id*. at *5. In this regard, the Board began by noting that the D.C. Circuit found that offsite employees may be regarded as trespassers by the employer and this must be considered in weighing the access rights of offsite employees. *Id.* "[O]f course," the Board continued, "[b]roadly viewed, any employee engaged in activity to which the employer objects on its property, might be deemed a trespasser, not an invitee: the employer arguably is free to define the terms of its invitation to employees." *Id.* Thus, the Board observed, there is "an inherent tension" between "an employer's private property rights and the Section 7 rights of its employees." *Id.* (citing *Republic Aviation Corp.*, 324 U.S. at 802 n.8 ("Inconvenience or even some dislocation of property rights, may be necessary in order to safeguard the right to collective bargaining.")).

The Board went on to note that, as the Supreme Court had made clear, it is the "'task of the Board'" to "'resolve conflicts between [Section] 7 rights and private property rights, and to seek a proper accommodation between the two.'" *Id.* (quoting *Hudgens*, 424 U.S. at 521)). The Board further noted that with respect to off-duty, onsite employees, the Board's accommodation of the two competing rights has been widely accepted by the courts via the *Tri-County* rule; that is, the Board has authority under Section 8(a)(1) of the Act to prevent employers from denying off-duty employees seeking to assert their organizational rights under Section 7 access to outside non-working areas of the employer's property unless the employer presents valid business justifications for the restriction. *Id.* The situation of off-duty offsite employees "implicates some distinct considerations," the Board continued. *Id.* at *6. "On one view, such employees are (as [Petitioner] here describes them) 'strangers' to the employer, in contrast to off-duty, onsite employees. . . . Of critical importance, on the other hand, is the fact that an employment relationship exists between them and the employer, which distinguishes offsite employees from the ordinary trespasser, who truly is a stranger." *Id.* Because of the existence of this employment relationship, the Board observed, "the employer has a lawful means of exercising control over the offsite employee (even regarded as a trespasser), independent of its property rights." *Id.* That is, "[s]urely it is easier for an employer to regulate the conduct of an employee—as a legal and a practical matter—than it is for an employer to control a complete stranger's infringement on its property interests. The employer, after all, controls the employee's livelihood." *Id.*

The Board acknowledged that an employer, in protecting its interests and preserving its property rights, does not face precisely the same scenario in dealing with the access rights of off-duty, onsite employees as opposed to off-duty, offsite employees; however, the Board opined, in the context of the latter case, "an employer's property interests, as well as its related management interests, may be given due recognition

without granting it the unqualified right to exclude offsite employees pursuing organizational activity." *Id.* The result of an employer possessing such an unqualified right against off-duty offsite employees, the Board proclaimed, would effectively be to foreclose the exercise of Section 7 rights, and such a result runs counter to the Supreme Court's admonition that the "'[a]ccommodation between employees' [Section] 7 rights and employers' property rights . . . must be obtained with as little destruction of one as is consistent with the maintenance of the other.'" *Id.* (quoting *Hudgens*, 424 U.S. at 521 (internal quotation marks and citation omitted)).

Having found that off-duty offsite employees enjoy Section 7 organizational rights of access that are freestanding and nonderivative, and having recognized that employers possess private property concerns regarding the access of off-duty offsite employees seeking to exercise Section 7 organizational rights, the Board then went on to balance these competing interests.

### 3. Balancing Section 7 Rights Against Private Property Interests

In balancing the respective rights, the Board concluded that "the Section 7 organizational rights of offsite employees entitle them to the outside, non-working areas of the employer's property, except where justified by business reasons." *Id.* at *6. The Board went on to explain that "[i]n weighing those reasons, we will take into account an employer's 'predictably heightened property concerns' (in the words of the *ITT Industries* court) when offsite, as opposed to onsite, employees are involved." *Id.* For example, the Board noted that

> [i]n some cases, an influx of offsite employees might raise security problems, traffic control problems, or other difficulties that might well justify an employer's restriction (or even prohibition) of such access. Appropriate measures might also be justified, for

> example, to require apparent trespassers to identify themselves and thus to determine whether the person seeking access is, in fact, an offsite employee of the employer.

*Id.* at 7. The Board cautioned, however, "that an employer must demonstrate why its security needs or related business justifications warrant restrictions on access by offsite visiting employees. We will review an employer's proffered justification carefully, on a case-by-case basis." *Id.*

In applying this balance to the facts of the instant case, the Board first found that Chavez and Davenport, as "offsite employee visitors" to Petitioner's Highland facility and its Bakersfield facility, respectively, sought access to the facilities to promote the Union and the benefits that it offered. *Id.* The Board then found that in exercising their Section 7 rights to organize at facilities other than those to which they were assigned to work, Chavez and Davenport did so for the purpose of "strengthening their own Union and ultimately to better their own working conditions." *Id.* Thus, the Board concluded, "these employees [Chavez and Devenport] had a freestanding, nonderivative right of access under the Act." *Id.* The Board also found that to the extent that Chavez and Davenport entered onto Petitioner's parking lot or outside break area against Petitioner's rules, they trespassed onto the property (i.e., they were not invitees); however, where in each instance a single visiting offsite employee entered an outside area of the facility, the Board concluded that the interference with Petitioner's property interests "was not substantial." *Id.*

"Critically," the Board explained, it examined Petitioner's business justifications for its rule against allowing the offsite employees access rights. *Id.* In doing so, the Board noted that Petitioner's primary reason for prohibiting offsite organizing employees access rights was to provide for the "'welfare, peace and tranquility'" of its nursing home residents. *Id.* The Board found that the offsite employees did not enter the nursing homes where they would be most likely

to come in direct contact with patients. The Board also found that Petitioner's witness, Dr. Stone, a geriatric specialist, admitted that a new face on the premises might as likely stimulate as disturb one of the residents. *Id.* Finally, the Board observed that Petitioner failed to show how a visiting employee organizer might disturb the nursing home residents any more than a visiting delivery person or a visitor coming to see a resident. *Id.*

Another business justification proffered by Petitioner was that given its many facilities and employees, it would be extremely difficult and burdensome to keep track of all its employees. The Board was unpersuaded by this argument as applied to the facts of this case inasmuch as in each instance a single offsite employee sought access at one of Petitioner's facilities, and Petitioner, in disallowing access, did not contend that it was unable to determine the employment status of the offsite employee. *Id.*

The final justification offered by Petitioner for its no access rule was the Union's "dignity campaign." *Id.* at *8. Specifically, according to Petitioner, the ALJ prevented it from introducing evidence at the hearing for the purpose of establishing that the Union and its supporters had previously engaged in violent and disruptive actions. But the Board noted that its rule forbidding access to offsite employees was not tailored to address violent and disruptive acts; rather, the Petitioner would prohibit all access by offsite visiting employees. "Indeed," the Board proclaimed, "employees Chavez and Davenport acted appropriately and with decorum in attempting to engage in organizational activity. Thus, we agree with the [ALJ] that the [Petitioner] could not establish its business justification defense by reference to alleged union activity occurring at other places and at other times." *Id.*

Having found that the balance of rights tipped in favor of the offsite employees under the facts of this case, the Board concluded that Petitioner had violated "Section 8(a)(1) by maintaining a provision of its solicitation and distribution

policy which it enforced to prohibit the employees of one of [Petitioner's] facilities from gaining access to the nonworking outside areas at any other facility for the purpose of union organizing and enforcing that provision." *Id.* (footnote omitted).

In a footnote to the Board's decision, the Board agreed with the ALJ that "at least until July 12, 1995, [Petitioner] maintained a rule for its nonunion service staff in California which stated that 'When you are off duty, don't return to the facility unless you are picking up your paychecks or are making an authorized visit." *Id*. at n.10. The Board also agreed with the ALJ that this provision unlawfully prohibited off-duty employees from returning to the nonwork areas of their own facility unless "authorized," and therefore Petitioner had violated Section 8(a)(1) in this regard as well. *Id.*

### 4. The Board's Remedy for Petitioner's Violations

To remedy the violations found by the Board, it was ordered that Petitioner post cease and desist notices at all of its nonunion facilities in California. The ALJ had recommended that Petitioner be required to post cease and desist notices at the three facilities directly involved in the proceeding; however, the Board ordered a broader remedy.

### C. Analysis

### 1. Section 7 Organizational Rights of Offsite Employees

The value of an employee's right to organize in a collective effort for union protection is well steeped in the law and jurisprudence. As the Supreme Court recognized in *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180, 189 (1978) (footnote omitted):

The enactment of the NLRA in 1935 marked a fundamental change in the Nation's labor policies.

Congress expressly recognized that collective organization of segments of the labor force into bargaining units capable of exercising economic power comparable to that possessed by employers may produce benefits for the entire economy in the form of higher wages, job security, and improved working conditions. Congress decided that in the long run those benefits would outweigh the occasional costs of industrial strife associated with the organization of unions and the negotiation and enforcement of collective-bargaining agreements. The earlier notion that union activity was a species of 'conspiracy' and that strikes and picketing were examples of unreasonable restraints of trade was replaced by an unequivocal national declaration of policy establishing the legitimacy of labor unionization and encouraging the practice of collective bargaining.

Today the Court is faced with determining the scope of the organizational access rights of a certain type of employee—an employee of the parent company, but not one of the facility at which the employee seeks access, known as an "offsite employee."

Petitioner, the employer in this case, likens offsite employees to non-employees (or strangers) and argues that the scope of their rights should be limited to that of the rights of non-employees as set forth in *Babcock*. That is to say, as a rule, an employer cannot be compelled to allow distribution of union literature by non-employee organizers on his property, but where "the location of a plant and the living quarters of the employees place the employees beyond the reach of reasonable union efforts to communicate with them," the employer's property rights may be "required to yield to the extent needed to permit communication of information on the right to organize." *Babcock*, 351 U.S. at 112. Stated differently, Petitioner argues that to the extent that the offsite employees have organizational access rights, the rights are purely derivative of the onsite employees, and Petitioner cannot be ordered to allow the offsite employees to trespass

onto its property absent a showing that the onsite employees have no other reasonable method to learn of their rights to organize.

Respondent, the NLRB, likens offsite employees to off-duty onsite employees, and argues that the scope of their rights should be that as set forth in *Tri-County*. That is to say, an employer cannot deny off-duty onsite employees access to outside non-working areas of the facility for purposes of exercising organizational rights unless the employer has "justified business reasons" for doing so. *Tri-County*, 222 N.L.R.B. 1089. Stated differently, the NLRB argues that offsite employees enjoy organizational rights that are nonderivative, such that Petitioner cannot lawfully deny offsite employees access to its property without "justified business reasons" for doing so.

The employee/non-employee distinction for purposes of determining organizational access rights is significant because "[b]y its plain terms, [] the NLRA confers rights only on *employees*, not on unions or their nonemployee organizers." *Lechmere*, 502 U.S. at 532 (emphasis in *Lechmere*). Indeed, in commenting on its ruling in *Babcock*, the Supreme Court opined that in *Babcock* it

> explained that the Board had erred by failing to make the critical distinction between the organizing activities of employees (to whom § 7 guarantees the right of self-organization) and nonemployees (to whom § 7 applies only derivatively). Thus, while "[n]o restriction may be placed on the employees' right to discuss self-organization *among themselves*, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline," "no such obligation is owed to nonemployee organizers."

*Lechmere*, 502 U.S. at 846 (quoting *Babcock*, 351, U.S. at 113) (emphasis added, citations omitted).

In seeking to strike the proper balance of rights in *Hudgens*, 424 U.S. at 522, the Court distinguished *Babcock* based on the fact that "the § 7 activity [in *Hudgens*] was carried on by [the employer's] employees (albeit not employees of its shopping center store), not by outsiders [or nonemployees]." Furthermore, in *Hudgens*, the Court noted that in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945), a wholly different balance was struck between the employees and employers than was struck in *Babcock* because "the organizational activity [in *Republic Aviation*] was carried on by employees already rightfully on the employer's property, since the employer's management interests rather than his property interests were there involved." *Hudgens*, 424 U.S. at 522 n.10. The *Hudgens* Court found this difference to be "'one of substance.'" *Id.* (quoting *Babcock*, 351 U.S. at 113).

Against this backdrop, the Board's finding that offsite employees enjoy Section 7 organizational rights of access that are non-derivative was reasonable under the law. *See Chevron*, 467 U.S. at 842-43; *cf. Turnbull Cone Baking Co.*, 778 F.2d at 295 ("If the Board errs in determining the proper legal standard, the appellate court may refuse enforcement on the grounds that the order has 'no reasonable basis in law.'"). To conclude otherwise would do violence to the plain language of the Act, *see* 29 U.S.C. § 157, and run counter to decisions from the Court which make clear distinctions in the scope of an individual's § 7 organizational access rights based upon an individual's status as an employee or a non-employee. *See, e.g., Lechmere*, 502 U.S. at 532.

Furthermore, in reaching its conclusion, the Board properly considered the D.C. Circuit's concerns expressed in *ITT Industries*, 251 F.3d at 1004—that the Board failed to engage in any meaningful analysis and explain its interpretation of the Act. As noted, in an attempt to satisfy the criticisms of the D.C. Circuit in *ITT Industries* regarding the issue before this Court, the Board took account of the Act and the Supreme Court's pronouncements in reaching its decision that offsite employees enjoy non-derivative organizational rights.

*First Healthcare Corp.*, 2001 WL 1685280, at *4 ("Nothing in either the Act or the Supreme Court's decisions establishes that Section 7 rights of the employees of a particular employer, *as against that employer*, are somehow derivative of other employees' rights, when they are exercised at a location other than the customary site of employment.") (emphasis in original). The Board also engaged in a meaningful analysis of why offsite employees are more akin to onsite-employees for purposes of Section 7, noting in part that offsite and onsite employees share the same common concerns as to a specific employer, not only as to employment in general for purposes of garnering union support, but also on matters relating to such things as wages, benefits, and other workplace issues. As the Board observed, the fact that offsite employees seek to organize their fellow employees at a different location suggests that they believe that there a basis to make a common cause.

Petitioner argues that the Board's decision runs counter to Supreme Court precedent that stranger employees (offsite employees) are trespassers and therefore have no independent right of access to Petitioner's facilities where they are not otherwise actually employed. In this regard, Petitioner relies heavily upon *Babcock* and *Lechmere*, and Petitioner would be correct in its argument if it could demonstrate that the Board's conclusion that offsite employees are more akin to non-employees than onsite employees is unreasonable. Instead, Petitioner presupposes that offsite employees (or "stranger employees" in Petitioner's words) should be considered non-employee trespassers, and simply reiterates the D.C. Circuit's criticisms in *ITT Industries* without taking into account the Board's attempts to satisfy the D.C. Circuit's concerns. Such arguments woefully miss the mark under this Court's review inasmuch as the Court is to give deference to the Board's findings if reasonable.

Likewise, we are not persuaded by Petitioner's argument that the Board's decision is erroneous because it goes beyond the holding of its prior decisions, finding that stranger

employees had a right of access onto their employer's property only when the stranger employees shared a community of interests with the onsite employees. In this regard, Petitioner relies in part upon *United States Postal Service*, 318 NLRB 466 (1995), wherein the Board found that offsite employees had a right of access to the employer's property for organizational purposes, noting that the offsite employees

> enjoy[ed] the same benefits and working conditions regardless of the facility at which they work. For example, vacation benefits accrue in the same manner and rate regardless of an employee's assigned facility. Years of employment are counted toward an employee's pension from the day the employee is hired to the day he or she retires, regardless of which facility he or she is assigned. In addition, an employee who is involuntarily transferred from one postal facility to another maintains his or her seniority regardless of the change of facility.

*Id.* at 467.

Here, contrary to Petitioner's claims, the Board did in fact recognize the common interests shared by offsite and onsite employees, in part, when it noted that "[w]hen an offsite employee seeks to encourage the organization of similarly situated employees of another employer facility, the employee seeks to further his own welfare. In attempting to organize the unorganized, employees seek strength in numbers to increase power of their union and ultimately to improve their own working conditions." *First Healthcare Corp.*, 2001 WL 1685280, at *4. The Board further found in this regard that "[p]recisely because they work for the same employer, even at different workplaces, employees will often have common interests and concerns related to wages, benefits, and other workplace issues that may be addressed by concerted action." *Id.* at *5.

Petitioner also relies upon a case decided by the Fifth Circuit in 1960, *NLRB v. Great Atlantic & Pacific Tea Co.*, 277 F.2d 759 (5th Cir. 1960), wherein the court found against the Board and held that an employer may forbid union solicitation by employees in stores other than stores in which the soliciting employees worked, when the solicitation was occurring *inside* the employer's facility. *Id.* at 763. As the NLRB argues, the distinction regarding inside-versus-outside access by offsite employees is significant and clearly distinguishes *Great Atlantic & Pacific* from the matter at hand, particularly when this case was decided long before *Tri-County* and much of the Supreme Court's later jurisprudence.

Thus, we conclude that the Board's interpretation of the Act as providing offsite employees nonderivative and substantial Section 7 organizational rights was reasonable and should be given deference.

### 2.   **Employer's Private Property Concerns**

We are not persuaded by Petitioner's argument that the Board failed to consider Petitioner's private property rights in deciding the scope of Section 7 rights of offsite employees. In this regard, Petitioner argues that evidence of prior acts would have revealed that the offsite employees were not seeking access to Petitioner's property for the purpose of organizing the onsite employees, but rather for the purpose of pressuring Petitioner. Thus, according to Petitioner, this evidence was relevant to show the true motivation behind the offsite employees' acts and Petitioner's need to exclude them.

As argued by the NLRB, evidence was introduced at the hearing showing that the offsite employees were on Petitioner's property for the purpose of distributing organizational materials. The record supports the NLRB's claim where the leaflets distributed by the offsite employees in question carried a clear organizational message and solicited employees to call or mail in cards to find out more

information about the Union. Thus, the Board's finding as to the relevancy of this evidence was not unreasonable.

In addition, the Board recognized that as to offsite employees, an employer may have "heightened property-right concerns" when offsite (as opposed to onsite) employees seek access to property to exercise their Section 7 rights; however, with this recognition in mind, the Board was not persuaded that Petitioner's concerns, or alleged "justified business reasons," outweighed the offsite employees' access rights in this case.

### 3. Balancing the Offsite Employees' Section 7 Rights Against the Employer's Property Concerns

The Board crafted the following test along the lines of *Tri-County* for determining whether, on a case-by-case basis, the Section 7 organization rights of offsite employees should bow to the property concerns of the employer:

(1) under Section 7 of the Act, offsite employees (in contrast to nonemployee union organizers) have a nonderivative access right, or organizational purposes, to their employer's facilities; (2) . . . an employer may well have heightened property-right concerns when offsite (as opposed to onsite) employees seek access to its property to exercise their Section 7 rights; but (3) . . . on balance, the Section 7 organizational rights of offsite employees entitle them to access to the outside, non-working areas of the employer's property, except where justified by business reasons, which may involve considerations not applicable to access by off-duty, on-site employees. To this extent, the test for determining the right to access for offsite visiting employees, differs, at least in practical effect, from the *Tri-County* test for off-duty, on-site employees.

*First Healthcare Corp.*, 2001 WL 1685280, at *3.

Under the facts of this case, the Board's decision that the balance of rights tips in favor of the offsite employees was supported by substantial evidence. Petitioner failed to support its claim that it was necessary to deny the offsite employees access in order to preserve the "welfare, peace and tranquility" of its nursing home residents. Indeed, as found by the Board, the offsite employees did not enter the inside of Petitioner's facilities, nor have the offsite employees ever sought access to the inside of the facilities where they would most likely come in contact with or be observed by a resident. Moreover, as the Board also found, even if the residents were to come in contact with an offsite employee, evidence was admitted that a new face on the premises may just as likely stimulate as disturb one of the residents. Finally, Petitioner failed to show that if an offsite employee did have contact with a resident, the offsite employee might be more likely to disturb a resident than, say, a delivery man. Although Petitioner's interest in maintaining the "welfare, peace and tranquility" of its residents is a noble interest, Petitioner has failed to demonstrate why this interest is a justifiable one in prohibiting the offsite employees from having access to its facilities under the facts of this case.

Similarly, Petitioner failed to proffer evidence to support its alleged business reason for denying offsite employees access—that it would be extremely difficult and burdensome to keep track of all of its employees. In fact, the record indicates that issue of offsite employee identification was not a problem here. When offsite employee Davenport was barred from engaging in organizational activity, he was wearing her employee identification badge, and when Chavez was barred from engaging in organizational activity, she was identified by an onsite employee as one of Petitioner's offsite employees. As found by the Board, Petitioner did not contend that it was unable to identify the offsite employees in this case. Thus, the Board's conclusion that this reason bowed to the offsite employees' rights was supported by substantial evidence and reasonable.

Moreover, the Board's order expressly provides Petitioner with a means of denying access if it is faced with an inordinate number of offsite employees seeking access to a facility. Specifically, the Board expressly stated that

[i]n some cases, an influx of offsite employees might raise security problems, traffic control problems, or other difficulties that might well justify an employer's restriction (or even prohibition) of such access. Appropriate measures might also be justified, for example, to require apparent trespassers to identify themselves and thus to determine whether the person seeking access is, in fact, an offsite employee of the employer.

*Id*. at *7. Thus, if Petitioner is faced with a security concern by not being able to identify offsite employees in an orderly or reasonable fashion, the Board has taken account of such a situation and may well consider the employer's denial of access in such a situation to be justified. As the Board indicated, it would decide such situations on a "case-by-case basis" thus illustrating that Petitioner in this case, or any other similarly situated employer, would not be without recourse if it were faced with security concerns, traffic problems, or other difficulties in allowing offsite employees access to its facilities.

As to Petitioner's claim that its no access rule was necessary due to the Union's dignity campaign, substantial evidence supports the Board's conclusion that this alleged reason fails in light of the record. Indeed, the record indicates that Chavez and Davenport acted appropriately, and nothing in Petitioner's rule indicates that it was designed to deny access to violent or disruptive offsite employees. As found by the Board, Petitioner's sweeping no access rule was not tailored to justify the result. Thus, substantial evidence supports the Board's determination in this regard as well.

Finally, Petitioner's argument that in striking the balance, the Board was required to consider whether the onsite employees had a reasonable way to acquire information about the union on their own, is misplaced inasmuch as such an inquiry is made only when *nonemployees* are on an employer's property. *See Babcock*, 351 U.S. at 112.

### D.  Summary

The Board's decision has a reasonable basis in the law, and substantial evidence on the whole supports the Board's conclusion that Petitioner violated Section 8(a)(1) by denying offsite employees seeking to exercise their Section 7 organizational rights access to its facilities. *Turnbull Cone Baking Co.*, 778 F.2d at 295.

### III. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT PETITIONER VIOLATED SECTION 8(a)(1) OF THE ACT BY MAINTAINING OR ENFORCING A RULE THAT PROHIBITS ITS OFF-DUTY EMPLOYEES FROM SOLICITING IN THE OUTSIDE NONWORK AREAS OF THE FACILITY WHERE THEY WORK.

### A.  Background Into Basis for the Violation

In addition to finding that Petitioner violated Section 8(a)(1) of the Act by denying access to offsite employees, the Board also found that at least until July 12, 1995, Petitioner violated Section 8(a)(1) by maintaining a rule that prohibited off-duty employees from soliciting in the exterior non-work areas of the facility at which they were employed. The rule to which this violation applied was included in Petitioner's employee handbook under the heading "Solicitation and Distribution Policy" and stated as follows: "When you are off duty, don't return to the facility unless you are picking up your paychecks or are making an authorized visit." *First Healthcare Corp.*, at *8 n.10 (hereinafter termed "the no access rule" or "the no access policy"). The term "authorized

visit" was defined by Petitioner's labor counsel as a return to the facility for a "work/job-related reason." (J.A. at 686.)

Petitioner seeks review of the Board's decision in this regard claiming that the no access rule issue was not properly before the Board for procedural reasons. Petitioner also argues that because the no access rule had been disposed of several years earlier and was not in effect in 1995, the Board's findings regarding the no access rule were not supported by substantial evidence.

This case was originally submitted to the Board in December of 1995 on a stipulated record. The stipulated facts related exclusively to the prior issue dealing with the access rights of offsite employees. The Board decided that the stipulation had been improvidently accepted, and remanded the matter for a hearing before the ALJ. At the hearing, Petitioner argued that the no access rule was no longer at issue, but the NLRB argued otherwise, noting that the motion to transfer the proceedings included the allegations in the amended complaint which included allegations that the no access rule violated the Act. The NLRB continued by arguing that Petitioner could point to nothing in the record to indicate that the no access rule charges were dropped. The ALJ found it significant that there was nothing in the record to indicate that the access rule charges had been dropped or settled. The ALJ went on to find that

> General Counsel [the NLRB] has noted accurately that the remand order of September 30, 1996, returns the case to the Regional Director for quote, appropriate action, closed quote. And that is [sic] would be possible for the Board to return the proceeding with instructions to confine action to the hearing on the portion of the evidence not then before the Board, specifically the nature of the solicitation and distribution activities alleged in the Complaint. Accordingly, I have to find that the Board did not restrict the remand solely to the taking of evidence on the nature of the allegedly

> protected activities. That fact in conjunction with the fact that there is no explicit agreement to forebear prosecution if any of the so called extraneous 8-A-1's and given the detail and competence of legal representation enjoyed by Respondent [now Petitioner] throughout the proceeding, I can not [sic] find that there was an agreement to abandon the so called extraneous 8-A-1's [the no access rule violation]. Accordingly, the Motion to Dismiss paragraphs nine (9) through (14) of the Complaint is denied as well.

(J.A. at 27-28.) The Board agreed with the ALJ that the no access rule issue was properly at issue at the hearing.

## B.   Issue on Appeal

On appeal, Petitioner makes the same arguments as it did before the ALJ regarding the propriety of the no access rule being at issue. Petitioner claims that because the no access rule issue was not included in the stipulated facts, it was understood by the parties that they were "effectively disposing of that issue" and it should not have been considered. Petitioner also claims that it was denied due process when the ALJ considered the no access rule because Petitioner believed that the no access rule had been disposed of and therefore did not have reasonable notice or an opportunity to prepare a defense. Petitioner contends that while the case was pending, the company was sold, its regional office closed, and documents related to the no access rule issue were discarded or misplaced. Thus, according to Petitioner, it could not prepare its defense.

We are not persuaded by Petitioner's claims. The record does not support Petitioner's due process argument where the record contains copies of Petitioner's handbooks with the no access rule at issue dating back to 1990. In addition, the record indicates that on February 1, 1995, in a letter to the NLRB's regional attorney, Petitioner's counsel provided the NLRB with a copy of the solicitation policy setting forth the

no access rule at issue. Thus, aside from general allegations that it was unable to prepare a defense, Petitioner provides nothing in particular that prevented it from defending the no access rule allegations, and in fact the record demonstrates that Petitioner provided the NLRB with information regarding this issue.

Petitioner next argues that contrary to the Board's finding, that "at least until July 12, 1995," Petitioner unlawfully maintained the no access rule, Petitioner's no access rule was never in effect in 1995. In support of its argument Petitioner notes that at the hearing before the ALJ, Petitioner placed into evidence an employee handbook, purportedly in effect in 1995, which did not contain the no access rule at issue. Petitioner claims that the ALJ erroneously failed to consider this handbook, and instead relied upon a June 1, 1995 memorandum from Petitioner to the heads of its non-union California facilities which provided that "Employees are not to return to their own facilities for reasons other than those contained in the handbook." (J.A. at 858.) However, Petitioner continues, the ALJ failed to read the next paragraph of the internal memorandum which states that "Your own employees may be permitted to return to the private property perimeter of their own facilities (including parking lots), even if their purpose is to organize." (J.A. at 858.) Petitioner contends that the sentence relied upon by the ALJ was in reference to the internal portion of Petitioner's facilities, and not the outside perimeter as the next paragraph explained. Petitioner notes that the policy of denying off-duty employees access to the inside of the facility is not unlawful under the Act, and thus the ALJ erred in relying on the internal memorandum as evidence that Petitioner maintained an unlawful no access policy until at least July 12, 1995.

The NLRB argues that while it is true that the ALJ relied upon the statement that said "Employees are not to return to their own facilities for reasons other than those contained in the handbook.[,]" the ALJ found this significant because there was nothing in the record to indicate that the 1995 handbooks

had been distributed, and thus concluded that the reference was to earlier handbooks containing the unlawful no access rule. The NLRB thus concludes that the ALJ did not err in this regard. In addition, the NLRB contends that the 1995 handbook and the ALJ's reliance on the memorandum aside, substantial evidence on the record supports the Board's finding.

Specifically, the NLRB contends that the unrebutted testimony of union representative Gary Guthman indicated that during an exchange at Petitioner's Bakersfield facility on July 12, 1995, employees were not allowed to distribute leaflets in non-work areas outside the facility during non-work hours unless they had the approval of management. The NLRB also contends that in addition to Guthman's testimony, the manager at the Bakersfield facility, Maria Favereaux, testified that Petitioner's no access rule in 1995 was to allow employees on the premises only while they were working. The NLRB notes that although Petitioner's counsel attempted to impeach Favereaux as to her understanding of the no access rule in effect in 1995, the ALJ was correct in noting that even if he credited Petitioner's impeachment of Favereaux, this did nothing to negate the fact that Petitioner enforced the no access rule at least until July 12, 1995.

Although the no access policy was removed from the 1995 employee handbooks and the internal memorandum does state that off-duty employees should be allowed to return to the perimeter of the facility even for the purpose of organizing, the fact remains that Guthman's testimony regarding Petitioner's unlawful acts on July 12, 1995 was unrebutted. Petitioner failed to come forward with evidence to demonstrate that up until July 12, 1995, other off-duty employees were allowed access to the facility. Accordingly, where Petitioner does not dispute that prior to the 1995 employee handbook, its handbooks contained an unlawful no access rule regarding access by off-duty employees to the outside of its facilities, and where Petitioner failed to come

forward with evidence to rebut Guthman's testimony, substantial evidence supported the Board's finding.

## C.  Summary

Substantial evidence on the record supported the Board's finding that at least until July 12, 1995, Petitioner maintained a rule for its non-union service staff in California which prevented the off-duty access to the outside areas of the facility in violation of Section 8(a)(1).

## IV. THE BOARD ACTED WITHIN ITS BROAD REMEDIAL DISCRETION BY ORDERING PETITIONER TO POST REMEDIAL NOTICES AT EACH OF ITS NONUNION FACILITIES IN CALIFORNIA.

Upon finding that a violation of the Act has occurred, the Board's power to fashion a remedy is a broad discretionary one, subject to limited judicial review. *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 215-16 (1964). Thus, the Board's remedial orders will not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act. *Id.* (citation and internal quotation marks omitted).

Statewide cease and desist postings are proper if the unfair labor practices in which the employer was found to have been engaging were part of a company-wide policy, or if it is shown that employees at other facilities were actually aware of them. *Consol. Edison Co. of N.Y.*, 323 N.L.R.B. 910, 911-12 (1997). In this case, the Board did not limit the cease and desist posting to the three facilities involved in this matter, as recommended by the ALJ. Rather, the Board ordered that the cease and desist postings be made at all of Petitioner's California facilities. The Board reasoned that based on the record, it was satisfied that Petitioner maintained unlawful rules of denying access to off-duty offsite and off-duty onsite

employees at its facilities, and that posting at all of Petitioner's facilities in California was thus required.

Petitioner argues that there was no evidence that any off-duty employee was asked to leave any of Petitioner's premises; thus, no state-wide posting was needed. Petitioner's argument has no merit. In its decision, the Board expressly stated that it was requiring the cease and desist orders to be posted state-wide based on *both* of Petitioner's unlawful rules. It is true that the violations in question were limited to three of Petitioner's facilities; however, because the violations included offsite employees not being allowed access to Petitioner's facilities, it is a logical conclusion that all of Petitioner's facilities should be made aware of the cease and desist notice. In other words, it should be made known at all of Petitioner's facilities that offsite employees cannot be denied access to the outside areas of Petitioner's facilities for purposes of exercising their Section 7 rights because Petitioner maintained company-wide policies prohibiting access. *See Consol. Edison Co. of N.Y.*, 323 N.L.R.B. at 911-12. Thus, the Board acted within its broad discretion in fashioning the remedy in this case where the remedy advances the policies of the Act. *Id.*

## CONCLUSION

Substantial evidence exists on the record to support the Board's findings of fact, and because there are no errors of law in the Board's decision, we **DENY** Petitioner's application for review of the Board's order in Case No. 01-2478; and **GRANT** the Board's application for enforcement of its decision and order in Case No. 01-2673.

---

**DISSENT**

---

JULIA SMITH GIBBONS, Circuit Judge, dissenting. This case presents the difficult question of whether the National Labor Relations Board (the Board) erred in concluding that off-duty, off-site employees have a section 7 right to access the outside non-working areas of their employer's property that outweighs the employer's property rights, except where restrictions on access are justified by business reasons. In reaching this conclusion, the Board purported to balance the employees' section 7 rights against the employer's property rights. Reviewing the Board's decision for substantial evidence, the panel majority concludes that the Board did not err in finding that the balance "tips in favor" of the section 7 organizational rights of off-site employees. (Majority Op. at 28.) I dissent because I believe that a *de novo* standard of review applies in reviewing whether the Board erred in concluding that the employees' section 7 rights outweigh the employer's property rights, and, under a *de novo* standard of review, the balance in this case favors the employer's property rights.[1]

---

[1] I agree with the panel majority's holding that the Board's conclusion that off-site employees have non-derivative and substantial section 7 organizational rights was reasonable and should be given deference. The panel majority's application of the substantial evidence standard of review to this issue is proper because the issue involves the interpretation of the NLRA. *See Albertson's Inc. v. NLRB*, 301 F.3d 441, 448 (6th Cir. 2002) ("we review the Board's factual application and statutory construction under a substantial evidence standard, a deference that is warranted if the Board's conclusions are based upon a reasonably defensible construction of the Act.") Furthermore, I agree with the majority's holding set forth in section III of the opinion that substantial evidence supports the Board's finding that Petitioner violated section 8(a)(1) by maintaining or enforcing a rule that prohibits its off-duty employees from soliciting in the outside nonwork areas *of the facility where they work*. (Majority Op. at 31 (emphasis added)).

The majority correctly states that we review the Board's factual application and statutory construction under a substantial evidence standard. *Albertson's Inc. v. NLRB*, 301 F.3d 441, 448 (6th Cir. 2002). This level of deference, however, is only warranted if the Board's conclusions are based on a reasonable construction of the Act. *Id.* Moreover, "this Court gives no deference to the Board where the Board's decision 'rest[s] on erroneous legal foundations.'" *Id.* (quoting *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 539 (1992)). "Further, where the Board's conclusions of law do not interpret the NLRA, we review those conclusions *de novo*." *Id.* Similarly, we give no deference to the Board's interpretation of judicial precedent and review *de novo* the Board's interpretation of Supreme Court and Sixth Circuit precedent. *Id.* (quotation omitted); *see Lee v. NLRB*, 325 F.3d 749, 754 (6th Cir. 2003).

The Board's conclusion that "[o]n balance . . . the Section 7 organizational rights of offsite employees entitle them to access to the outside, non-working areas of the employer's property, except where justified by business reasons" does not involve an interpretation of the NLRA. Instead, determining whether employees' section 7 rights outweigh an employer's property rights requires a careful examination of the relevant Supreme Court and Sixth Circuit precedent, as well as cases from other circuits, and a determination of how that case law applies to the facts present here. In reaching its decision below, the Board relied upon several Supreme Court decisions and ultimately declared that allowing employers to exclude off-site employees pursuing organizational interests would be "inconsistent with the Supreme Court's admonition that the '[a]ccommodation between employees' [Section] 7 rights and employer's property rights . . . must be obtained with as little destruction of one as is consistent with the maintenance of the other.'" *First Healthcare Corp.*, 336 N.L.R.B. 62, 2001 WL 1685280, at *6 (2001) (quoting *Hudgens v. NLRB*, 424 U.S. 507, 521 (1976)). The Board did not discuss any basis in the statute for deciding this issue. *Cf. First Healthcare Corp.*, 2001 WL 1685280, at *10 (2001)

(Hurtgen, dissenting) (noting that this case falls between two landmark Supreme Court cases, but finding more relevant the Supreme Court's opinion in *Hudgens* and the D.C. Circuit's opinion in *ITT Industries v. NLRB*, 251 F.3d 995 (2001)). Consequently, the proper standard of review of the Board's balancing of employees' section 7 rights and employer's property rights is *de novo*. *Lee*, 301 F.3d at 448 ("where the Board's conclusions of law do not interpret the NLRA, we review those conclusions *de novo*.")

The Supreme Court first addressed the tension between employees' right to organize and employers' property rights in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945). In *Republic Aviation*, the Court held that employees have a right to organize their fellow employees at their employer's facility, provided that the solicitation is confined to nonworktime and distribution was confined to nonworktime and nonwork areas. *Id.* at 803-05. The Court addressed the issue of the accommodation of section 7 rights versus property rights more directly in *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105 (1956). The Court held that non-employees, such as union organizers, have no independent right of access to an employer's property to organize employees at and around an employer's facility. *Id.* at 113. An exception exists where the inaccessibility of the employees prevents "reasonable union efforts to communicate with them." *Id.* The Court noted that both organizational rights and property rights are granted by the federal government, and "[a]ccommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other." *Id.* at 112. More recently, in *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 533 (1992), the Supreme Court reaffirmed the general rule that "an employer cannot be compelled to allow distribution of union literature by nonemployee organizers on his property."

While not directly on point, the Supreme Court's decision in *Hudgens v. NLRB*, 424 U.S. 507 (1976), is most analogous to the present case. In *Hudgens*, striking factory employees

sought to picket at a retail store owned by their employer and located in a shopping mall. *Id.* at 509. In addressing whether the mall owner unlawfully interfered with the employees' section 7 rights by threatening to have them arrested, the Court focused on the need to "seek a proper accommodation" between section 7 rights and private property rights. *Id.* at 509, 521. According to the Court, "[w]hat is 'a proper accommodation' in any situation may largely depend upon the content and the context of the [section] 7 rights being asserted." *Id.* at 521. Furthermore, "[t]he locus of that accommodation . . . may fall at differing points along the spectrum depending on the nature and strength of the respective [section] 7 rights and private property rights asserted in any given context." *Id.* at 522.

The Court also explained that neither *Republic Aviation* nor *Babcock* was controlling. With regard to *Republic Aviation*, the Court stated that a different balance exists when the organizational activity is "carried on by employees already rightfully on the employer's property." *Id.* at 522 n.10. The Court distinguished *Babcock* on the basis that it involved "organizational activity carried on by non-employees on the employer's property." *Id.* at 521. The *Hudgens* Court identified the differences present in the case before the Court, including the fact that economic strike activity was involved, the activity was conducted by employees, albeit at a different location, and the property involved was that of a third party. *Id.* at 522. After noting these differences, the Court remanded the case for an accommodation between the section 7 rights and the property rights. *Id.* at 523.

The only decision to address the issue presently before us is the D.C. Circuit's opinion in *ITT Industries Inc. v. NLRB*, 251 F.3d 995 (D.C. Cir. 2001). In *ITT Industries Inc.*, the court was faced with the question of "the scope of the Board's authority under §§ 7 and 8(a)(1) to prevent employers from prohibiting parking lot access to off-site employees who are seeking to engage in organizational activities that would be lawful if pursued by on-site employees." *Id.* at 1000. The

court began by noting that while "[i]t is not clear that the Supreme Court's access cases foreclose the Board's interpretation that § 7 confers upon offsite employees some measure of free-standing, nonderivative organizational access rights," the Supreme Court's cases "do make clear . . . that the Board must take account of an offsite employee's trespasser status." *Id.* at 997. Because the Board failed to take into consideration the fact that the question of off-site employees' access rights was an open one and failed to consider the employer's property rights or the concerns presented by trespassing employees, the court remanded the case to the Board for further consideration in light of these concerns. *Id.* at 1004-05. The court then stated that assuming the off-site employees have some measure of free-standing, nonderivative access rights, "the Board must balance the conflicting interests of the employees to receive information . . . with the employer's right to control the use of his property." *Id.* at 1005. The court noted that even where all employees are in the same representational unit, the employees at the different facilities may have different interests. *Id.* Therefore, the court held that if the Board determines that the off-site employees have non-derivative section 7 access rights, "it must then adopt a balancing test that takes proper account of an employer's predictably heightened property concerns." *Id.*

As the above cases make clear, every access case requires an accommodation between employees' section 7 rights and employers' property rights. *See, e.g., Hudgens*, 424 U.S. at 521-22 (considering property rights where employees were asserting nonderivative organizational right). Here, the off-site employees seek access to another facility owned by their employer for the purpose of assisting other employees in organizing. The employees are not directly pursuing their own interests because they are already organized. While organizing the employees at other facilities may benefit the already organized employees, the extent of the benefit must be balanced against the employer's property rights. As the dissenting judge in the Board opinion noted, the benefit of such organizational activities to the existing employees may

be less when the employees are in different bargaining units because they do not have common interests. *First Healthcare Corp.*, 2001 WL 1685280, at * 11. "The fact that they are in separate units means that it has not been shown that they share a 'community of interest.'" *Id.* The lack of common interest indicates that the benefit to the already organized employees who are asserting their section 7 rights by engaging in union solicitation at facilities other than the facility where they work was slight.

Unlike the employees in *Hudgens*, who were directly pursuing their section 7 right to strike  in order to bring economic pressure to bear on their employer, the off-site employees here have failed to set forth a direct and immediate interest in gaining on-site access to Petitioner's other facilities. While the off-site employees here have a section 7 right to assist employees elsewhere in their organizational efforts, *Hudgens* does not stand for the proposition that such off-site employees have a section 7 right to come onto the Petitioner's property at a facility where they do not work. Moreover, there is no evidence that the off-site employees in the instant case were unable to communicate effectively with the employees of the targeted facilities in other manners, including contacting such employees from the public sidewalks and entrances to the facilities' parking lots, without trespassing.

Having examined the nature of the organized employees' section 7 rights, it is necessary to consider the employer's property interests. As the court noted in *ITT Industries Inc.*, the off-site employees are trespassers at the site where they do not work. 251 F.3d at 1004. Unlike onsite employees who are considered business invitees, off-site employees who violate nonsolicitation policies are considered trespassers. *See Leachmere*, 502 U.S. at 530. The Board failed to consider the trespasser status of the off-site employees despite its recognition that off-site employees may be deemed trespassers and  instead focused on the employer's ability to control an off-site employee's conduct once such employee is

on the property. The Board virtually ignored the employer's property rights and concentrated on the business justifications for excluding off-site employees and the employer's management interests. The majority opinion also focuses almost entirely on the issue of business justification, instead of the employer's property interest, which represents a distinct legal concept. Furthermore, the majority fails to recognize that an employee can also be a trespasser. The term trespasser and nonemployee are not synonymous. *Cf. Hudgens*, 424 U.S. 521-22 n.10 (noting that property interests, as opposed to management interests, are implicated when organizational activity is carried on by employees that are not rightfully on the employer's property).

Property rights are an essential part of the United States Constitution. *See NLRB v. Windemuller Elec., Inc.*, 34 F.3d 384, 394 & n.8 (6th Cir. 1994) (citing *Dolan v. City of Tigard*, 512 U.S. 374 (1994)). According to the Supreme Court, property owners have the right to control the use of their property and regulate those who wish to use it. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). Moreover, the right to exclude others is "one of the most essential strands in the bundle of rights that are commonly characterized as property." *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987) (quotations omitted). The Court has described a property owner's right to exclude as one of the most "treasured" aspects of property rights. *Loretto*, 458 U.S. at 435.

Petitioner has a fundamental property right to exclude others from its property. *See Babcock*, 351 U.S. at 112. The exercise of the property right to exclude others falls within the scope of state trespass law. *Sears, Roebuck & Co. v. San Diego Dist. Council of Carpenters*, 436 U.S. 180, 181

(1978).[2] Under California law, individuals working on the property of another, in the interest of the property owner, are business invitees. *Jenson v. Kenneth I. Mullen, Inc.*, 211 Cal.App.3d 653, 658 (Cal. Ct. App. 1989). When an invitee enters upon portions of the property where he has no right to be, however, he may become a trespasser. *Powell v. Jones*, 133 Cal.App.2d 601, 606 (Cal. Ct. App. 1955). California law defines trespasser as one who has entered the property without consent by the owner. *See Oettinger v. Stewart*, 24 Cal.2d 133, 136 (Cal. 1944). The off-site employees in this case were trespassers, not business invitees like on-site employees. On balance, Petitioner's right to exclude the off-site employee trespassers outweighs the off-site employees' section 7 right to assist in organizing other employees with whom they lack common interests.

For all the reasons set forth above, I would find that the Board erred in concluding that Petitioner violated section 8(a)(1) of the Act by denying access to its property to persons employed by Petitioner at another facility owned by Petitioner.

---

[2] The Court in *Sears* noted that private property rights yield to section 7 rights only in "cases involving unique obstacles to nontresspassory methods of communication with the employees." 436 U.S. at 205-06 n.41.